**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **CHERYL W.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 19 C 4904** |
| | ) | |
| **KILOLO KIJAKAZI, Acting** | ) | **Magistrate Judge Finnegan** |
| **Commissioner of Social Security,[1]** | ) | |
| | ) | |
| **Defendant.** | ) | |

## ORDER

Plaintiff Cheryl W. seeks to overturn the final decision of the Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act. The parties consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), and Plaintiff filed a brief explaining why the Commissioner's decision should be reversed or the case remanded. The Commissioner responded with a competing motion for summary judgment in support of affirming the decision. After careful review of the record and the parties' respective arguments, the Court agrees with Plaintiff that the case must be remanded for further proceedings.

## BACKGROUND

Plaintiff applied for DIB in November 2016, alleging disability since March 1, 2012 due to rheumatoid arthritis, subacute cutaneous lupus erythematosus, degenerative joint disease, spinal stenosis, coronary artery disease, hypertriglyceridemia, unstable diabetes

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. She is automatically substituted as the named defendant pursuant to FED. R. CIV. P. 25(d).

mellitus, peripheral neuropathy, and spondylosis. (R. 658).[2] Born in September 1956, Plaintiff was 55 years old as of the alleged disability onset date, and 56 years old as of her June 30, 2013 date last insured. (R. 657). She has a high school diploma and specialized training as a medical transcriptionist. (R. 20, 659). Plaintiff worked for approximately 16 years as an executive assistant, performing mostly secretarial functions, until she was promoted to office services supervisor in 2002 and became responsible for managing the mailroom, office services, reception, and switchboard. (R. 21-24, 660). She quit that job in April 2004 following a change of ownership and then started her own company providing secretarial services. (R. 26-28, 660). In 2011 and 2012, Plaintiff worked as an executive assistant for a rehab institute. (R. 31). Her position was eliminated around March 1, 2012, and Plaintiff says she realized at that time that she was not performing up to standards as a result of her impairments. (R. 38-40). Though Plaintiff continued to work sporadically into 2016, her earnings did not rise to the level of substantial gainful activity. (R. 31-34).

The Social Security Administration denied Plaintiff's applications initially on February 23, 2017, and again upon reconsideration on May 26, 2017. (R. 81-100). Plaintiff filed a timely request for a hearing and appeared before administrative law judge Deborah M. Giesen (the "ALJ") on May 15, 2018. (R. 15). The ALJ heard testimony from Plaintiff, who was represented by counsel, and from vocational expert Clifford M. Brady. (R. 17-80, 718). On September 20, 2018, the ALJ found that Plaintiff's hypertension, non-obstructive coronary artery disease status-post angioplasty and stent placement, sleep apnea, and sero-negative rheumatoid arthritis are all severe impairments, but that they

---

[2]     The actual application is not in the record.

did not meet or equal any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 at any time prior to the June 30, 2013 date last insured ("DLI"). (R. 106-07). Plaintiff's additional impairments, including diabetes, hyperlipidemia, and degenerative disc disease, were not severe prior to the DLI. (*Id*.).

After reviewing the evidence, the ALJ concluded that during the 16-month period from the March 1, 2012 alleged disability onset date through the DLI, Plaintiff retained the residual functional capacity ("RFC") to perform her past relevant work as an administrative assistant and an office manager, and so was not disabled. (R. 111). The Appeals Council denied Plaintiff's request for review (R. 1-6), leaving the ALJ's decision as the final decision of the Commissioner and, therefore, reviewable by this Court under 42 U.S.C. § 405(g). *See Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005).

In support of her request for reversal or remand, Plaintiff argues that the ALJ erred in assessing her RFC and, relatedly, improperly discounted her statements regarding the limiting effects of her impairments. For reasons discussed in this opinion, the Court finds that the ALJ did not adequately consider Plaintiff's testimony in determining the RFC.

## DISCUSSION

### A.    Standard of Review

Judicial review of the Commissioner's final decision is authorized by 42 U.S.C. § 405(g) of the Social Security Act (the "SSA"). In reviewing this decision, the court may not engage in its own analysis of whether Plaintiff is severely impaired as defined by the Social Security regulations. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). Nor may it "'displace the ALJ's judgment by reconsidering facts or evidence or making credibility determinations.'" *Castile v. Astrue*, 617 F.3d 923, 926 (7th Cir. 2010) (quoting

*Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007)). The court "will reverse an ALJ's determination only when it is not supported by substantial evidence, meaning 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Pepper v. Colvin*, 712 F.3d 351, 361-62 (7th Cir. 2013) (quoting *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011)).

In making its determination, the court must "look to whether the ALJ built an 'accurate and logical bridge' from the evidence to [his] conclusion that the claimant is not disabled." *Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009) (quoting *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008)). The ALJ need not, however, "'provide a complete written evaluation of every piece of testimony and evidence.'" *Pepper*, 712 F.3d at 362 (quoting *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (internal citations and quotation marks omitted)). Where the Commissioner's decision "'lacks evidentiary support or is so poorly articulated as to prevent meaningful review,' a remand is required." *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009) (quoting *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002)).

## B.     Five-Step Inquiry

To recover disability benefits under the SSA, a claimant must establish that she is disabled within the meaning of the SSA. *Snedden v. Colvin*, No. 14 C 9038, 2016 WL 792301, at *6 (N.D. Ill. Feb. 29, 2016). A claimant is disabled if she is unable to perform "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to law for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a). In determining whether a claimant suffers from a disability, an ALJ must

conduct a standard five-step inquiry, which involves analyzing: "(1) whether the claimant is currently employed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling; (4) if the claimant does not have a conclusively disabling impairment, whether [s]he can perform her past relevant work; and (5) whether the claimant is capable of performing any work in the national economy." *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012) (citing 20 C.F.R. § 404.1520). If the claimant meets her burden of proof at steps one through four, the burden shifts to the Commissioner at step five. *Moore v. Astrue*, 851 F. Supp. 2d 1131, 1139-40 (N.D. Ill. 2012).

**C.    Analysis**

Plaintiff argues that the case must be reversed or remanded because the ALJ failed to identify the evidentiary basis for her RFC determination. A claimant's RFC is the maximum work that she can perform despite any limitations. *See* 20 C.F.R. § 404.1545(a)(1); SSR 96-8p, at *1-2. "Although the responsibility for the RFC assessment belongs to the ALJ, not a physician, an ALJ cannot construct h[er] own RFC finding without a proper medical ground and must explain how [s]he has reached h[er] conclusions." *Amey v. Astrue*, No. 09 C 2712, 2012 WL 366522, at *13 (N.D. Ill. Feb. 2, 2012).

The ALJ found that during the 16-month period from the March 1, 2012 alleged disability onset date through the June 30, 2013 DLI, Plaintiff retained the RFC to perform light work as defined in 20 C.F.R. § 404.1567(b), meaning: occasionally lifting and carrying 20 pounds; frequently lifting and carrying 10 pounds; performing "a good deal of walking or standing"; doing some pushing and pulling of arm or leg controls if sitting most

of the time; and doing all the requirements of sedentary work, including fine dexterity. (R. 107). *See also Sosinski v. Saul*, 811 F. App'x 380, 380 (7th Cir. 2020). SSR 83-10 elaborates that:

> "Frequent" means occurring from one-third to two-thirds of the time. Since frequent lifting or carrying requires being on one's feet up to two-thirds of a workday, the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday. Sitting may occur intermittently during the remaining time.

SSR 83-10, 1993 WL 31251, at *6. *See also Angela L. v. Saul*, No. 1:20-CV-00481-SEB-DML, 2021 WL 2843207, at *3 (S.D. Ind. July 7, 2021). The only other restrictions Plaintiff had were: no working around unprotected heights, open flames, or dangerous moving machinery; no climbing ladders, ropes, or scaffolds; and no concentrated exposure to dusts, fumes, gases, poor ventilation, or extreme cold. (R. 107-11).

### 1. Medical Evidence

Plaintiff argues that the ALJ failed to tie this RFC to specific medical evidence in the record. She first notes that the two State agency reviewers issued opinions on February 22 and May 25, 2017, stating that there was insufficient information about Plaintiff's functioning at or around the June 30, 2013 DLI to assess an RFC. (R. 85, 94). The ALJ did not assign any specific weight to these opinions but Plaintiff claims the ALJ implicitly rejected them by finding that Plaintiff had at least some functional restrictions. In Plaintiff's view, this created an evidentiary deficit that the ALJ could not fill with lay medical speculation. (Doc. 15, at 5; Doc. 24, at 4). The flaw in this argument is that the ALJ provided a detailed recitation of the medical records that support the RFC assessment, and Plaintiff points to no other opinion evidence that suggests she had greater functional limitations during the relevant period. *Compare Suide v. Astrue*, 371

F. App'x 684, 690 (7th Cir. 2010) (evidentiary deficit created where the ALJ rejected a treating physician's opinion and "[t]he rest of the record simply does not support the parameters included in the ALJ's residual functional capacity determination."). *See also Alma v. Berryhill*, No. 16 C 2035, 2017 WL 2936707, at *13 (N.D. Ill. July 10, 2017) ("Since an RFC is a legal instead of medical conclusion, an ALJ is entitled to assess a claimant's RFC without [a medical source's] guidance when the record is sufficient to do so and when the ALJ adequately explains the basis of his reasoning.").

Plaintiff does not dispute that the ALJ discussed all of the relevant medical records, but she disagrees that they demonstrate an ability to lift and carry up to 20 pounds occasionally, and sit, stand, and walk for 6 hours in an 8-hour workday despite evidence of cardiac impairment and degenerative changes in her hips and back.  (Doc. 15, at 6; Doc. 24, at 4-5).  Beginning with Plaintiff's coronary artery disease, the record reflects that she saw cardiologist Suresh H. Wadhwani, M.D. on December 15, 2011 with complaints of occasional sharp chest pain lasting less than 10 seconds for the previous few months.  (R. 731, 732).  Plaintiff had undergone an angioplasty and stent placement in 2008 and Dr. Wadhwani ordered diagnostic imaging to assess her new atypical chest pain.  (R. 109, 731).  On April 19, 2012, less than two months after the March 1, 2012 alleged disability onset date, Dr. Wadhwani noted that an echo/stress test was abnormal. (R. 733-34).  Myocardial perfusion imaging performed on August 12, 2012 showed "large perfusion abnormality of moderate intensity in the basal anterior, mid inferior and apical inferior myocardial walls."  (R. 775-76).  This defect was "present on the resting images consistent with prior myocardial infarction."  (R. 776).

The following month, on September 13, 2012, Dr. Wadhwani performed an angiogram due to Plaintiff's abnormal stress test with dyspnea (shortness of breath) on exertion. (R. 109, 807). The procedure revealed: mid-to-moderate mid to distal LAD (left anterior descending coronary artery) disease; mild circumflex disease; moderate proximal right coronary artery disease; patent stent of the distal right coronary artery with mild restenosis; and significant restenosis of the mid to distal right coronary artery, which was successfully dilated. (R. 809). Plaintiff was discharged on September 14, 2012. (R. 979). When Plaintiff next saw Dr. Wadhwani on September 20, 2012, she reported only mild improvement of her shortness of breath. Dr. Wadhwani prescribed Furosemide (a diuretic) and scheduled another echocardiogram for October 3, 2012. (R. 735-36). That test showed borderline LVH (left ventricular hypertrophy); mild right ventricular enlargement and suggestion of decreased left ventricular compliance versus diastolic dysfunction; mild left atrial enlargement; trivial mitral insufficiency without prolapse; and mild tricuspid insufficiency. (R. 746).

At a follow-up appointment on January 30, 2013, Dr. Wadhwani concluded that the electrocardiogram was worse, "consider[ed] angina equivalent." (R. 737). Plaintiff's symptoms included chest pain at rest, dizziness, dyspnea on exertion, shortness of breath, and weakness. (R. 738). Dr. Wadhwani ordered another stress test for February 7, 2013. (R. 737). Before that could happen, however, Plaintiff went to the emergency department on February 2, 2013 with shortness of breath and chest pain on exertion with associated mild nausea. The chest pain was mostly relieved with rest and Nitro and a chest x-ray was within normal limits, but Plaintiff was admitted for close monitoring and cardiac consultation. (R. 953, 1132). Dr. Wadhwani diagnosed unstable angina with

some dyspnea on exertion (R. 1120), and on February 4, 2013, he performed a coronary angiography, left ventriculography, and left heart catheterization. (R. 109, 745). The procedures showed mild luminal irregularities of the left main coronary artery; mild nonobstructive coronary disease of the proximal left anterior descending artery, with mild disease of the first and third diagonal branches; mild ostial disease of the ramus intermedius; no evidence of disease in the circumflex coronary artery; mild to moderate disease of the proximal right coronary artery with two patent stents in the mid and distal segment without evidence of in-stent restenosis; mild disease of the posterior descending artery; and normal systolic performance. (R. 745).

Plaintiff objects that the ALJ failed to explain how these abnormal findings support an RFC for light work. But Plaintiff ignores subsequent evidence that the February 4, 2013 angiography was successful. Following the procedure, Dr. Wadhwani did not believe further surgical intervention was warranted and recommended continued medical management and risk factor modification. (R. 109, 1122). On February 11, 2013, Plaintiff reported to Dr. Wadhwani that she experienced no chest pain while wearing a Nitro-Patch, and on June 10, 2013 she made no complaints of chest pain or dyspnea at all. (R. 109, 741-42). Though Plaintiff reported having dyspnea on exertion in November 2013, Dr. Wadhwani encouraged her to increase her activity at that time (R. 743), and a stress echocardiogram performed in June 2014, a year after the DLI, was normal. (R. 109, 743, 1097, 1156-57). In fact, Plaintiff did not require additional surgical intervention again until March and December 2016, some three years after the DLI. (R. 109, 739-42). Furthermore, none of Plaintiff's physicians ever indicated that her heart condition limited her ability to lift, carry, sit, stand, or walk, or recommended that she restrict those activities

in any way. And even if Plaintiff could not handle the requirements of light work as a result of her coronary artery disease, the VE testified that Plaintiff's past relevant work as an office manager and administrative assistant could be done at both the light and sedentary levels of exertion. (R. 71-72, 111).

With respect to Plaintiff's joint problems, she had lumbar fusion surgery in 2001 and developed some neuropathy in both legs but continued working full-time for many years. (R. 751, 980). She received regular treatment for rheumatoid arthritis at South Suburban Arthritis Group ("SSAG") beginning in November 1999, but the notes are largely illegible. (R. 1285-1314). On September 24, 2012, Plaintiff had x-rays of the lumbar spine which showed post-surgical degenerative changes as follows: mild disc space narrowing at L3-L4; small endplate osteophytes at multiple levels; mild to moderate multilevel bilateral facet arthropathy in the lumbar spine with no evidence of spondylolysis; and laminectomy changes at the L5 level. (R. 805). X-rays of the hips taken the same day showed mild degenerative joint disease of both hips. (R. 806). A treatment note from SSAG dated December 7, 2012 stated that Plaintiff's back and hip pain could be a nerve problem. Her medications included prednisone and OxyContin. (R. 109, 1299).

Plaintiff once again focuses on these abnormal findings while ignoring other pertinent evidence showing only mild limitation. To begin, Plaintiff does not identify any additional treatment she received related to her back and hips from December 2012 until July 30, 2013, one month after the June 30, 2013 DLI. On that date, Plaintiff saw primary care physician Jason W. Savage, M.D. with complaints of low back pain and occasional pain in the buttocks and posterior thighs. (R. 110, 750). She reported that the previous month she had lifted something and suffered an acute exacerbation of her symptoms, but

ibuprofen "significantly helps alleviate the pain." (*Id*.). On exam, Plaintiff exhibited mild tenderness to palpation of the paraspinal muscles. At the same time, she was neurologically intact with 5/5 strength in the lower extremities, and had intact sensation to touch, negative straight leg raise tests bilaterally, and pain free range of motion in the hips. (R. 110, 751). Dr. Savage reviewed x-rays of Plaintiff's lumbar spine taken that day and determined that they "looked quite good" with "minimal adjacent segment degeneration." (*Id*.). He encouraged Plaintiff to engage in a regular aerobic and core strengthening exercise program and continue taking ibuprofen as needed for pain. (*Id*.). Plaintiff's next complaint of back pain was not until May 29, 2014, nearly a year after the June 30, 2013 DLI. (R. 767).

The Court recognizes that Plaintiff's joint condition deteriorated in mid-2014. A June 9, 2014 MRI of the lumbar spine showed severe spinal stenosis at L3-L4 above the fusion level, and on July 30, 2014, Plaintiff had an L3-L4 lumbar interbody fusion discectomy and arthrodesis due to lumbar spondylosis and lumbar stenosis with neurogenic claudication. (R. 110, 920, 948, 1492). But this was more than a year after the June 30, 2013 DLI, and Plaintiff must prove the existence of a disability prior to that date. *See Pepper*, 712 F.3d at 355 ("The critical inquiry is whether [the plaintiff] became disabled at any time prior to . . . the date [the plaintiff] was last insured."). Again, no physician of record ever indicated that Plaintiff's degenerative joint changes prevented her from lifting, carrying, sitting, standing, and walking as set forth in the RFC before her eligibility for benefits expired.

2.      **Subjective Symptom Evaluation**

This does not end the Court's inquiry, however, because the RFC assessment must be based on all of the relevant evidence in the record, including testimony from the claimant. *Murphy v. Colvin*, 759 F.3d 811, 817 (7th Cir. 2014); SSR 96-5p, 1996 WL 374183, at *5. The regulations describe a two-step process for evaluating a claimant's own description of her impairments. First, the ALJ "must consider whether there is an underlying medically determinable physical or mental impairment(s) that could reasonably be expected to produce the individual's symptoms, such as pain." SSR 16-3p, at *2. If there is such an impairment, the ALJ must "evaluate the intensity and persistence of those symptoms to determine the extent to which the symptoms limit an individual's ability to perform work-related activities." *Id*. In evaluating a claimant's symptoms, "an ALJ must consider several factors, including the claimant's daily activities, her level of pain or symptoms, aggravating factors, medication, treatment, and limitations, . . . and justify the finding with specific reasons." *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009). An ALJ's assessment of a claimant's subjective complaints will be reversed only if "patently wrong." *Jones v. Astrue*, 623 F.3d 1155, 1162 (7th Cir. 2010).

Aside from citing the above medical evidence, the ALJ provided no other valid reasons for dismissing Plaintiff's allegations regarding pain and the additional limitations she experienced during the relevant period that could have affected her functional abilities. *Adaire v. Colvin*, 778 F.3d 685, 687 (7th Cir. 2015) (an ALJ cannot discount a claimant's subjective statements solely because they are not supported by objective medical evidence). For example, the ALJ made much of the fact that Plaintiff was able to travel by taxi and train, and drive a car to run errands in town and go longer distances

once or twice a week. (R. 42-43, 108, 110). Though the ALJ acknowledged Plaintiff's testimony that the driving caused pain in her legs and foot numbness (R. 43, 108), the ALJ said nothing about why any of these activities were inconsistent with Plaintiff's claimed inability to work on a full-time basis. *See Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012) (the ALJ must consider the differences between competitive work and activities of daily living because the claimant may perform the latter at will).

The ALJ also discounted Plaintiff's testimony based on an August 7, 2015 treatment note where Plaintiff reported having "good exercise tolerance overall" before the onset of back pain. (R. 110, 892, 1370). The record contains no information as to the meaning of that phrase, and the ALJ did not ask Plaintiff about this note during the hearing. As a result, it is unclear whether Plaintiff meant she could handle exercising for one hour a day, or just 15 minutes. And since Plaintiff complained of back and hip pain years earlier in September 2012 (R. 805-06), and required additional surgery in 2014, the "onset date" of her back pain for purposes of the treatment note is at best ambiguous.

The ALJ gave other aspects of Plaintiff's testimony short-shrift as well. Plaintiff has a history of rheumatoid arthritis and testified that she had pain and swelling in her hands that made it difficult to hold a pen and write. (R. 51). (*See also* R. 1331, May 2008 imaging showing moderate osteoarthritis in the right and left interphalangeal thumb joints, and mild osteoarthritis in the left and right first metatarsophalangeal joints; R. 1120, noting "some puffiness" in Plaintiff's hands related to RA). The ALJ noted Plaintiff's testimony (R. 108), but gave no explanation for failing to include any manipulative restrictions in the RFC. This is problematic because the VE testified at the hearing that Plaintiff could not perform her past relevant work if she could handle and finger on only an occasional basis.

(R. 73). "Although the ALJ need not discuss every piece of evidence in the record, he must confront the evidence that does not support his conclusion and explain why it was rejected." *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004).

The ALJ likewise provided no explanation for rejecting Plaintiff's testimony that her medications made her "foggy," which impaired her response time and ability to understand. (R. 52, 53). Plaintiff was taking Ambien (a hypnotic), Lorazepam (a sedative) and OxyContin (a narcotic pain medication) (R. 735), but the ALJ did not include any associated restrictions in the RFC or explain why they were not credible. *See Robert M. W. v. Saul*, No. 19 C 3165, 2020 WL 6801842, at *4 (N.D. Ill. Nov. 19, 2020) ("[T]he regulations require an ALJ evaluating a claimant's symptoms to consider the 'type, dosage, effectiveness, and side effects of any medication' the claimant takes or has taken."). The VE testified, however, that Plaintiff's past relevant work required a "higher level of concentration and cognitive astuteness." (R. 73).

Viewing the record as a whole, the ALJ did not adequately explain why she rejected Plaintiff's subjective statements regarding her limitations, which casts doubt on the reliability of the RFC. *Spicher v. Berryhill*, 898 F.3d 754, 757 (7th Cir. 2018) (the ALJ "must build an accurate and logical bridge from the evidence to her conclusion.") (internal quotations omitted). The case must be remanded for further evaluation of this issue.

## CONCLUSION

For the reasons stated above, Plaintiff's request to reverse or remand the ALJ's decision is granted, and the Commissioner's motion for summary judgment [22] is denied. Pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision is reversed, and this

case is remanded to the Social Security Administration for further proceedings consistent with this opinion.

ENTER:

Dated:  August 20, 2021

SHEILA FINNEGAN
United States Magistrate Judge